I intend to focus on the Interstate Agreement on Detainers Act issue and evidentiary issues in this case, but I am happy to discuss whichever issues the Court wishes me to address, and I am reserving six minutes for rebuttal. Well, the clock will continue to run, so if you want rebuttal, you'll just have to stop on your own. Yes, sir. When asked how much vermouth he wanted in his martini, Winston Churchill remarked, I would like to observe the vermouth from across the room while I drink my martini. So his version essentially was chilled gin and silence. That is how the United States treated the IADA here. They acknowledged it, they paid lip service to it, but they did not comply with it. Did Mr. Millsap ever return to state custody after he was brought in with writ? Thank you for that question, Your Honor. He was not returned to the Arkansas Department of Correction at any time after he was brought in. So he came in on a writ habeas corpus ad prosequendum. Yes, Your Honor, in February of 2009. How does this Interstate Detainer Act work in that instance? Why is it not just out of the case? Yes, Your Honor. So as I believe Mauro, Baxter, as well as the third case cited by a show, it is not which came first, it is whether the detainer was filed at all. And as this court found in Baxter v. United States, although Mr. Baxter was initially brought to federal court on a writ, ultimately a detainer was filed. The court refused to calculate the IADA from the initial writ, but did calculate it following the lodging of that detainer. But I think the Spady Trial Act indicates that if a prisoner is brought in on a writ, that the Interstate Detainer Act is out of the case. Isn't that true? In other words, that the ordinary course of the Spady Trial Act is applicable and not the provisions of the Detainer Act. Isn't that correct? Your Honor, had the United States not lodged a detainer, I believe Your Honor would be correct. However, they did, and at that point the IADA came into effect. Why isn't it just surplusage? Why isn't it just surplusage? Why is it sort of belts and suspenders, if you see what I mean? Yes, Your Honor. The concerns that the IADA was passed in the 1970s to address are still present upon the lodging of the detainer. And as this court made clear in Baxter v. United States, even though it found that there was no IADA violation, it did find that Article IV of the IADA applied once the United States lodged a detainer, even though Mr. Baxter was initially brought to court on a writ. So the fact that Mr. Millsap was initially brought to the court on a writ, it is our position, makes no difference that once the United States lodged that detainer, the IADA went into effect. That is the same situation as one of the three defendants in the Mauro case, Mr. Ford, who initially was brought to court on a writ, and ultimately a detainer was lodged. That is the same with the defendant in the Roy case. It was a writ before detainer, as here. And the Court of Appeals in that case rejected the government's argument that the IADA was inapplicable merely because he was initially produced in federal court pursuant to a writ rather than the detainer. And it cited Mauro specifically for that proposition. Did Baxter involve the same facts as we have here? In other words, was Baxter brought in on a writ, kept in federal custody the entire time, and then a detainer was belt and suspenders issued, so to speak? No, Your Honor. He was initially brought to court on a writ and returned to the receiving state's custody, I believe, either that same day or the following day. Okay. Isn't that a key difference? Because in Baxter, we also cite a couple of out-of-circuit cases like U.S. v. Woods, which would suggest that it's basically a meaningless event when you're brought in by a writ of ad prosecundum and then a detainer is issued that really didn't bring the person to federal custody. Your Honor, I would just point to kind of the next portion of that paragraph in the Baxter opinion where the court did find that Article IV applied, just was not violated, not from that initial coming into federal custody on a writ, but after the detainer was lodged, I believe a period of a few weeks later. But in Baxter, he was returned to state custody, right? Yes. And then the detainer was the thing that brought him back to federal custody, right? Your Honor, the United States lodged a detainer and then, I believe, used a writ to bring him back following the lodging of that detainer. But the court did note that it would not apply to transfers made pursuant or for the time period from prior to the detainer. But it did note that Article IV applied after that. It just found there was no violation. So while this case, the result does not go with our position, the analysis does that Article IV applies from the time the detainer was lodged. So the United States is going to make this argument, but the case law does not state that if a person is first brought to court on a writ, that the IADA does not apply. Mauro merely found that a writ itself does not act as a detainer in causing the IADA to come into effect. However, for that one defendant, Mr. Ford, a detainer was lodged and the act did apply to his case, not to two others where a detainer was never lodged. The IADA does not require the detainer to be served on the defendant, just that it be lodged. There is no personal service requirement for such in Article IV, and it was here. Again, I bring the court's attention to the case of United States v. Roy from the Second Circuit in 1985, very similar situation. Mr. Roy was brought to court on a writ before a detainer was lodged. He was arraigned before a detainer was lodged. Ultimately, a detainer was lodged and the government brought him into federal custody following that, and the Second Circuit found that the IADA was invoked at that time. Your Honor, just coming back to that Baxter case, we like the court's analysis, but again, we say it is factually distinguishable. In that case, Mr. Baxter pleaded guilty, so he did waive his IADA issues, which distinguishes it from this case, but we still argue that the court's analysis, finding that Article IV applied, controls here. Next, the district court erred by making several evidentiary errors that we believe require reversal and remand for retrial. I'm going to start with the mistrial based on Mr. Millsap's wife. So during the trial, multiple jurors reported to the court that they fell in safe due to his wife's conduct, as well as another person who looked quote menacing standing by their car. They reported this to the court on their own, and despite the United States' arguments, this was not simply defendant's supporters kind of giving a mean look to jurors in the courtroom, and it was arguably significantly greater than the issues in the two cases cited in the appellant's brief that were reversible for further investigation into whether the jury's verdict had been swayed by that contact. And the United States, in their brief, makes no mention of this other person who stood menacingly by a juror's car. So again, this was not something small. This was arguably aggravated assault, driving at someone as they were approaching their car in the street. This was arguably juror intimidation outside of the courtroom. And I mean, specifically, the district court informed the parties that two jurors were alarmed. That was the word that the court used when Millsap's wife looped around in her truck and took off real fast as they walked up the street to their cars the night prior to one of the multiple weeks, one day of the multiple weeks of trial. And then another juror was alarmed by a quote menacing person standing by their car when they went back to it after one night of trial. And this was all after Millsap's wife had been removed from the courtroom based on her conduct in the courtroom. So in the Simtob case, S-I-M-T-O-B cited in the appellant's brief, Simtob himself was accused of eyeballing a juror. And I'm using that term because that's the quote there, eyeballing a juror. The juror expressed fear that he had been threatened directly. The court refused to excuse the juror, and the court of appeals in that case reversed and remanded to make a better record on the issue of the juror's subjective fear and whether that influenced their verdict. And so despite the lack of any evidence there that Simtob had any direct contact with the jury, the presumption of prejudice applied because even in direct coercive contact could affect the peace of mind of the jurors and give rise to the remor presumption that we're arguing for here. Similarly, in the case of the United States v. Rutherford, it is a Ninth Circuit case from 2004. It is cited in Simtob. Again, it was federal agents who were in the courtroom kind of glaring at jurors throughout the trial. Apparently IRS and DOJ agents sat directly behind counsel table throughout the trial, which was multiple days. Several of them were key witnesses. The prosecution had been conversing with them throughout trial, and at least one juror alleged that several of the agents had regularly, quote, glared at her. And the Ninth Circuit there found the appropriate inquiry is whether the unauthorized conduct raised a risk of influencing the verdict or had an adverse effect on the deliberations. Again, it found an insufficient record. It remanded for the court to consider those jurors' subjective fears. So we believe that those two examples pale in comparison to what occurred outside the courtroom in this case. We believe reversal on this point is appropriate, but alternatively we would ask the court to remand. What exactly occurred? My understanding is she was in a truck. She looked at the jurors and then drove off. Why isn't that just physical presence? Why is that more than physical presence, stares, rebuffed attempts at conversation? Your Honor, my understanding is that she did a U-turn in the middle of the street to come right by the jurors as they were entering their cars in what we would argue was a threatening manner. And then also the second incident with an unknown man. We would argue in a threatening manner. What are the facts? Your Honor, from the record, the court noted Ms. Millsap's wife, quote, looped around in her truck and took off real fast as the jurors were walking up the street toward their cars the night prior. And when another juror walked to their car, they were alarmed by a, quote, menacing person standing by their car. And this, quote, alarmed the jurors, the two jurors who reported this to the court. Counsel, I'd like to ask a couple of questions having to do with the state of the record. Did you stipulate to the admissibility of the Iron Cross photo pretrial? That was one of your issues, I think. Yes, Your Honor. That the Helen Bond. Stipulated to the admission of that photo, the Iron Cross photo? Your Honor, we would defer to the record on that. Okay. So the other thing is, did the district court fail to make a finding required by U.S. against Bell that there was a conspiracy that would allow for these 801D2E statements to come in? Did he make a finding on that? Your Honor, ultimately he did. Not at the time. I thought the check, I'm sorry, I thought you were arguing that he did not make such a finding. Your Honor, he did not make such a finding at the time virtually any of those statements were introduced. He subsequently noted that just because the United States alleges someone is a co-conspirator, does not automatically make their statements admissible. He then admitted all of those. I'm sorry, I'm not understanding your answer. Under U.S. against Bell, once the testimony is in, all of that evidence under 801D2E has been admitted conditionally. And the condition is that the court at that time make a finding that there was some conspiracy which links all of that testimony. Was that finding made or was it not? Your Honor, I would defer to the record on that as well. Well, we thought you would know the record as the lawyer in the case. You don't know? Your Honor, I apologize. It is not. Thank you, sir. I see I've gone past my time. I would reserve the remainder for rebuttal. All right, very well. Ms. Mazzanti, we'll hear from you. Good morning, Your Honor. My name is Stephanie Mazzanti and I represent the United States in this matter. Marcus Millsap, an associate of the New Aryan Empire, solicited Wesley Gullet, the president of the New Aryan Empire, to murder a confidential informant and he participated in an extensive methamphetamine conspiracy. The court should affirm his conviction and sentence in this case. With respect to the IADA, the IADA did not apply under the plain language of Article 4 because Millsap was transferred initially under a writ, not a detainer. The detainer was not delivered to the ADC until after Millsap was already in federal custody. The United States made no subsequent, quote, written request for temporary custody or availability to the state under Article 4 and Millsap was never returned to the ADC. There was some suggestion, I think, in the appellate's brief that that writ was meant simply to be temporary in some respect. Was it because it says something about bringing the defendant in for the purpose of arraignment? Is that what the defendant was driving at? The writ did direct that the defendant be brought in for arraignment. The writ, I think, could be interpreted in different ways with respect to the return date. It says that he should be returned at the conclusion of the proceedings. And so in many districts and in our district at this point regularly, the United States Marshal Service will maintain custody of an inmate under that writ in their custody until the conclusion of the proceedings, which is consistent with the IADA and the anti-shuttling provisions. That you should resolve the proceedings in federal court, allow them access to the courts, and have the opportunity to consult with their counsel on their federal case, which again, all of that is consistent with the purposes of the IADA, as well as with the plain language of the IADA. And additionally, going to the plain language argument, there's no contention that Article 3 applies here by defense counsel in the brief at the district court. And so we're really looking at Article 4. And with respect to the plain language of Article 4, subparagraph A states whom the appropriate officer, it's referring to the appropriate officer, has lodged a detainer. And then additionally, whenever you go to subparagraph B, again, there's reference to who has lodged detainers. And then in paragraph C, it only comes into play in respect of any proceedings, quote, made possible by this article. And so the proceedings against Mr. Millsap in federal court, his presence in federal court was not made possible by a detainer. It was made possible by a writ before a detainer was ever sent anywhere. And additionally, Mr. Kaiser relies heavily on Baxter. I think that that's how you were distinguishing it, but why don't you tell me how you distinguish Baxter? Baxter is distinguishable because in that instance, the defendant went back to the ADC after the detainer was filed. If that had occurred in this case, we may have a different situation. But that's not what happened here. Here, we maintained him in federal custody to the conclusion of his proceedings. And so, again, and that's true for Roy as well. In Roy, the defendant was sent back to the state custody and then brought after the detainer was filed. And so if that occurs, then there's a different question before the court. Here, under these facts, the IADA does not apply. And the Supreme Court's language in Morrow supports that contention. Specifically, the Supreme Court discusses the fact that it relies on a detainer. It has, quote, previously lodged against a state prisoner. It also says that the U.S. is bound by the agreement when it, quote, provisions by filing a detainer against a state prisoner and then obtains custody, his custody by means of a writ. And so the court in Morrow did indicate that if you have a detainer in place and then you use a writ, the writ is a written request for temporary custody under the IADA. But it also discussed, in discussing Morrow's case, did discuss the fact that whenever you have someone brought in by a writ, the IADA does not come into play on the front end. The court's decision, other circuits' decisions, for example, in the Woods case, the Johnson case, the Great House case, and the Fulford case, all support that reading of the IADA. And so the United States requests that the court find the IADA did not come into play in this case as the district court held. To the extent that the defense claims in their reply that the United States misstated the district court's holding, that's not accurate. I would note that the district court denied the motion for the same reasons it denied Wesley Gullett's motion under the IADA. And if you look at docket 1439, it states that the oral motions made pursuant to the IADA are denied on all grounds for the reasons Gullett's previous IADA motion was denied. It cites docket 1004, which refers to the reasons that were given from the bench. And if you look at the reasons given from the bench at the May transcript on page 74, the court states multiple times that to the extent Judge Volpe found the IADA applied, the court district court was overruling that finding. It also stated on page 80, I've already ruled it doesn't apply to Mr. Gullett, and I haven't ruled at all as to Mr. Millsap at that point. And so I wanted to make that correction. With respect to the IADA, even if it applied, the district court properly found good cause, and there would be no reason to dismiss this case with prejudice. Going to the court's question with respect to the stipulation on the photo, yes, it was stipulated to, and so the United States contends that there's a waiver there, at the very least, plain error review. Going to the court's question regarding Bell, the district court did discuss the elements of the co-conspirator statement, the co-conspirator exception on pages 226 to 232, and at various points throughout the proceedings when it was making rulings on the admissibility of co-conspirator statements, to the extent that the district court did not, after the admission of the statements, come back and make rulings that would be what is contemplated under Bell. Even if that's the case, the defendant did not request or make any kind of demand for a further record on that point, and therefore, plain error would apply. And the court in McCracken, 110 F. 3rd 535, an Eighth Circuit case out of 1997, noted that if the defendant failed to request a Bell ruling, the court is to infer the requisite findings by the fact that the district court denied the motion for judgment of acquittal and review it for plain error. The same conclusion was reached in O'Meara, which is 895 F. 2nd 1216, Eighth Circuit, 1990. And there they stated that the court will not reverse for failure to follow Bell procedures without a showing of prejudice. There's no prejudice here. These statements were either co-conspirator statements that were properly admitted under applicable rules, or they were, in several instances, were not offered for the truth of matter asserted or were intended to show the effect on the listener. And so the government contends that the defendant has not made the requisite showing of prejudice in this case to be permitted reversal. With respect to the contentions discussed regarding a mistrial, the abuse of discretion applies here. The district court, as this court has previously noted, is in a better position to weigh any prejudice as in O'Meara, Eighth Circuit of 2012. And here, in this case, the rumor prejudice presumption was not triggered. This is akin to the facts in the Brown case, where the court stated that physical closeness, stares, and rebuffed efforts at conversations are not unique or uncommon in public trials. If this court were to reverse convictions or grant mistrial, or district courts were to grant mistrials based on people giving other people bad looks in the public trial setting, I think we would have, it would be difficult to trial, try cases to conclusion without that risk of a mistrial. With respect to the facts of what occurred, here, the, you had two jurors advising that truck, looked at them, and then took off, and the jurors felt like it was alarming. I would note that the United States did, in fact, acknowledge the other separate incident of a menacing individual on page 10 of its brief, footnote four. And despite the fact that defense counsel relies on SimTab and Rutherford, I would note that those are Ninth Circuit cases. I believe appellant mistakenly states that SimTab is an Eighth Circuit case in the brief, but I believe it is a Ninth Circuit case. And so, those cases are distinct from one because they're out of a separate circuit, but two, I think Brown controls in this instance. Additionally, on page 1297, the court told the jurors that he had talked to the lawyers about everything, and everything should be worked out. And so, in this instance, there was no information regarding a direct communication or a threat, and Millsap has failed to establish any kind of prejudice in this regard. He declined to make any kind of further record beyond a motion for mistrial at the trial court level, and the court should not reverse on that basis. The district court appropriately determined that a mistrial on those facts was not warranted. Going to the sufficiency of the evidence, in this- Excuse me, counsel. Before you go there, I had a specific question I'd like to ask. I was wondering, why was it necessary for the government to indicate that Mr. Hurley had been murdered, rather than simply that he passed away? Your Honor, the United States advised opposing counsel of the court in advance of trial of its intention to elicit the fact that Mr. Hurley had been killed, and that that was still under investigation. And it believed it was necessary to ensure that the jury was aware of why Mr. Hurley, who would have been a material witness to the case, was not available to testify. But why? Okay, but you could have simply have said he was deceased. And that would have been an alternative option. That was never raised as an alternative by defense counsel in that case. Or it was not? They did not suggest that we alternatively phrase it. We also suggested the court, if defense counsel requested it, could give a limiting instruction. That did not occur either. And so, with respect to Mr. Hurley's death, defense counsel had the opportunity to cross-examine on that point. It was made more than clear that Mr. Millsap had not been charged, that no one had been charged with respect to that death at that point, at the time of the trial. And defense counsel elicited, through that testimony in part, that others wanted Hurley dead. And so, it actually allowed defense counsel to elicit testimony that would show other people had potential motives for murdering Mr. Hurley. But why did the government want to raise the issue that he'd been murdered at all? And create this debate about who might have done it? Or this thought process in the jury as to who might have done it? Why not just say he's unavailable or deceased? Again, that would have been an alternative option. I think that the fact of the matter was that he was, in fact, murdered. And so, that was the truth. Well, there are a lot of facts that aren't brought into the trial if they're not relevant. And it was relevant to show why he was not present. And that was the whole point of the government putting that forward. Could the government have simply said he was killed? That would have been an alternative option. Again, defense counsel didn't make us any kind of suggestion about the alteration of the testimony, despite the fact that we alerted defense counsel in advance of trial of our intention to elicit that testimony. And also, discussed it at the bench with the court. And so, again, there's no prejudice because it was made more than clear that no one had been charged. That was very clear from the record. And Millsap has failed to demonstrate any kind of prejudice from that testimony. And even if there was any kind of prejudice, the evidence in this case was overwhelming with respect to the proof on the Rico conspiracy, the Vicar, and the drug trafficking conspiracy. Additionally, in Schumacher, the court, I would say, the court in the government's view made no determination that the government can't elicit the fact of a witness's unavailability before we get down the road too far. And so, the United States contends that Mr. Hurley's death could have been an alteration was a necessary part of the proof to demonstrate his unavailability. With respect- Say that last thing again. His death was necessary to show his unavailability? Eliciting proof of the fact that he was dead was necessary to show his unavailability. Because whenever the government couldn't risk being in a position, as I've been in other And then we're down to closing argument. The proof is, and the record is closed. Right. The defendant can say they could have called Hurley and so forth. Exactly. And so, that's why- But there's still a question of how you establish his unavailability. Anyway, we've talked about it. With respect to the sufficiency of the evidence in this case, the evidence established that Millsap was an associate of the New Aryan Empire. He was providing money for drugs, which was to the benefit of the organization. He was directly and regularly in contact and working with the president of the organization to obtain drugs, which was a large part of the organization's illegal enterprise. And additionally, he was provided protection by the NAE. And there was retaliation provided by NAE to Mr. Millsap in the form of the attempted murder of Mr. Hurley. Additionally, there were a number of instances in which the defendant solicited the murder of Mr. Hurley. He directly solicited the murder of Mr. Hurley through Kelly Duncan. He also, Mr. Gullett also solicited Mr. Hurley's murder through Kelly Duncan prior to Mr. Millsap directly approaching Kelly Duncan. Kelly Duncan was a member of the war, but he was an associate of the NAE. The information that we had is that they were trying to recruit Mr. Duncan into the NAE. We also had information in the testimony of Mr. Singleton about the conversation that occurs between Mr. Millsap and Mr. Gullett the day after the attempted murder whenever Mr. Millsap is mad, essentially, at Mr. Gullett and is instructing him that he needed to fix it. We also had Mr. Chandler's testimony about Mr. Millsap telling Mr. Gullett that he used an expletive, needs to die, with respect to Mr. Hurley. And then you also have the testimony of Robert Cody Hall about the importance of Mr. Gullett maintaining control and ensuring that anybody who retaliates against individuals who are associated with the organization will be taken care of. And that was a common theme throughout the trial, is that whenever individuals that are NAE members or associates have someone cooperate against them with law enforcement, then they take retaliatory action. That is not tolerated. And individuals, including many of our witnesses, were retaliated against by virtue of the fact that they cooperated with the government. We have broken jaws, beatings, stabbings. And so we also have instances that were testified to about other retaliatory efforts and the X-ing out of individuals, people being removed from the organization for perceived violations of the code of the organization. With respect to the RICO conspiracy, I think the Henley case is applicable here. And I would note that with respect to the maintaining and increasing a position, it need not be the sole or principal motive. People can have multiple motives for engaging in this sort of activity. I think it's important to note that Mr. Gullett didn't even know Mr. Hurley. And so the motivation for Mr. Gullett is to ensure that he maintains his position in the organization. He keeps the money flowing so that he can continue to engage in the narcotics trafficking that was a major component of NAE's money and power. And we have the evidence of the defendant being the financial backer of the organization through the testimony of Mr. Knox, Mr. Duncan, Mr. Singleton, and then also Robert Cody Hall. With respect to the Vicar murder, attempted murder, I think it's maybe most simple to go to the Pinkerton theory of liability first and analyzing that issue. The evidence is that the defendants, Wesley Gullett and Jeff Knox, both committed the attempted murder, that they were both members of the conspiracy, and that they were acting in furtherance of that conspiracy. With respect to whether it was in the scope of the conspiracy or reasonably foreseeable, it was. It was a natural or necessary part of that conspiracy. And the defendant was a member of the conspiracy at that time. And so I think that's probably the most straightforward analytical approach when looking at the Vicar attempted murder. But we also contend that the aiding and abetting could also be met in this case under the facts. And I think the Second Circuit opinion in Bruno is instructive in that regard. The drug conspiracy, I would note that there was overwhelming evidence of a large quantity of methamphetamine coming in and out of Mr. Millsap's house, being distributed by Mr. Millsap, being brought to Mr. Millsap directly by Mr. Gullett at times. And so the evidence there is overwhelming. And with respect to the remaining arguments set forth in the briefing, the United States stands on the arguments made in its brief. There are no further questions. I'll surrender the balance of my time. Very well. Thank you for your argument. Thank you. Mr. Kaiser, will he rebuttal? Yes. So I appreciate the judge's questions regarding Mr. Hurley's murder being introduced, or the fact of his murder being introduced at the trial. It's our position Mr. Hurley was not a necessary witness. The government was able to get an attempted murder conviction without him being there, and there were no statements attributed to him introduced throughout the trial. And while the Schumacher case made clear that this would have been relevant if the defense had commented on his absence, the facts there are very distinguishable. Schumacher involved a perjury charge where Mr. Schumacher, the alleged lie was that he had claimed not to have met with a particular person. And so clearly that person was a necessary and material witness. They had some sort of medical issue and were excused from trial, and the government was permitted to put on evidence explaining why that person was not there. But that is not the case here, where proof was able to happen without Mr. Hurley. And in a case where Mr. Millsap had been charged with the attempted murder of Hurley, the prejudice from the admission of the fact that he had been murdered was massive and really could not be surmounted. The only impression a jury could have had after hearing that Mr. Hurley had been murdered, after hearing all this evidence about Mr. Millsap allegedly ordering a hit on him, was that Millsap or one of his associates did the murder. Well, now, Ms. Mazzanti said you didn't ask to limit the evidence on Hurley's absence. Is that correct? It is, Your Honor. Well, what about that? Isn't that a problem for you? I mean, if you had said, Judge, just tell the jury that he's deceased or that he's unavailable for reasons that are irrelevant, and the judge had overruled that, we'd have a different situation. But is it an obvious error that would meet the plain error standard? It is our position that it is. Defense counsel at trial argued specifically that the evidence was irrelevant, should not be admitted in the first instance, and then argued it was overly prejudicial if it was admitted, given that he was charged with the attempted murder of that very individual. And given the unique fact pattern here, that he was convicted of attempted murder of that guy, and then the United States was introduced evidence that that guy was murdered. Say again what you say defense counsel objected to? They objected that evidence that Mr. Hurley was dead should not have been admitted at all. And they argued that the evidence that he'd been murdered was extremely overly prejudicial if there was any marginal relative appropriate value that it was outweighed. And then here, the defense did not comment on Mr. Hurley's being missing, and in that argument noted it would not do so. Where are you reading from? What page of the transcript? Or are those just your notes? Those are my notes, Your Honor. All right. We'll look it up. I thought you might have a citation. Thank you, sir. With regard to the four cases from out of circuit, the United States cited in support of its IAEA argument. Counsel, I'm sorry. Could you get a little closer to the microphone? I'm so sorry, sir. Yes. With regard to the four cases the United States cited from out of circuit on their IAEA argument, each case is distinguishable easily. Johnson v. Williams, the defendant in that case was tried in the receiving state, was returned to the sending state, and then a detainer to bring him back to the receiving state for sentencing. That's where he moved to dismiss. As the court knows, there is no right to speedy trials as it applies to sentencing. And the guy in that case sought dismissal of an indictment he had already been tried and convicted of. Also, the petitioner there had escaped. And there is a specific provision noting that the IAEA's provisions don't apply when someone has escaped. In Great House, the acts in this case, although the case came out in 1981, occurred prior to the Mauro decision in 1978. And Mauro was not retroactive. Also, this was a 2255 petition. And IAEA violations are not grounds for collateral attack. So that case is not applicable either. And finally, the Fulford case from the Third Circuit. Fulford, the issue there was whether being held on a probation revocation warrant that was unadjudicated constituted serving a term of imprisonment. The Third Circuit found it didn't. So that case is inapplicable as well. In conclusion, with regard to the IAEA issue, this court's case law makes clear that Article IV did apply. There was a speedy trial within the IAEA violation. And the case must be dismissed with prejudice based on the United States' conduct and pattern of negligence regarding those detainers. Millsap's convictions must be reversed and dismissed. Alternatively, reversed for retrial based on the evidentiary errors we've discussed and briefed. Alternatively, reversed for resentencing. I see that I'm out of my time. I appreciate the court's diligence and time in this matter. All right. Thank you for your argument. Thank you to both counsel. The case is submitted. The court will file a decision in due course. Yes, Your Honor. Counsel are excused.